UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas Wayne ALLISON and Sharon Lynn Freedman,
Defendants-Appellants.

No. 79–5556
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

May 5, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Thomas D. L. Collins, Columbus, Ga. (Court-appointed), for Allison.

Donald Michael Samson, Columbus, Ga. (Court-appointed), for Freedman.

William P. Adams, Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before HILL, GARZA and THOMAS A. CLARK, Circuit Judges.

PER CURIAM:

On March 24, 1979, Defendants Thomas Wayne Allison and Sharon Lynn Freedman, along with another couple, were traveling from Nashville, Tennessee to Columbus, Georgia. Near Pine Mountain, Georgia, they stopped at a self-service gasoline station, purchased $2.38 worth of gasoline, and Defendant Freedman attempted to pay the

manager of the station with a $20.00 bill. The manager suspected the bill of being counterfeit and refused to take it. Freedman went back to the car and returned with a $10.00 bill which the manager accepted.

After the defendants left the station, the manager telephoned the Harris County Sheriff's Department requesting that an officer contact him. In response, the Pine Mountain Chief of Police, Chief Bernatovitz, came to the station at which time the manager related the incident to him and gave the chief a description of the occupants and of the vehicle in which they were traveling. Chief Bernatovitz then radioed the Harris County Sheriff's Department, spoke with Deputy Sheriff Collier, related the information to him, and requested that Deputy Collier keep a lookout for the car fitting the description of that given by the station manager. Deputy Collier left the courthouse in his patrol car and soon thereafter saw a car and occupants fitting the description given by Chief Bernatovitz. He followed the car, radioed Lieutenant Seville for assistance and, when assistance came, Deputy Collier ordered the vehicle to stop.

Deputy Collier asked the driver, Allison, to get out of the car and explained to Allison that he had received a report that one of the occupants had tried to pass a counterfeit $20.00 bill in Pine Mountain. Allison responded, "yes, the man in Pine Mountain said the bill looked funny." Allison then took out his billfold and produced a $20.00 bill and handed it to Deputy Collier. Deputy Collier then asked if he had any more and Allison produced two additional counterfeit $20.00 bills. Deputy Collier placed Allison under arrest and gave him *Miranda* warnings.

After Allison had been placed under arrest, Deputy Collier asked him if he would mind if he looked in the trunk of Allison's car. Allison said no [that he (Allison) would not mind]. Allison removed the keys from the ignition and opened the trunk. Deputy Collier then searched the trunk and came across a travel shaving kit containing 117 counterfeit $20.00 bills. Another counterfeit $20.00 bill was found in the back seat of the auto. At that time, all occupants of the vehicle were taken to jail.

Three days later, an agent for the United States Secret Service visited the manager of the service station with two groups of photographs. One group of photographs consisted of six black and white photographs of females out of which the manager chose Mrs. Freedman's picture. The other group consisted of seven black and white photographs of men, four of which were individuals with mustaches and beards, as Allison had. Of these four photographs each contained date and location information on the identification plate hung around the subject's neck, as follows: Cobb County, Georgia, dated 1–26–69; DeKalb County, July 14, 1971; and two photographs indicating Harris County, Georgia, March 24, 1979. One of these latter two was of Allison and was identified by the station manager.

On April 30, 1979 a three count indictment was returned against both Allison and Freedman which charged them with (1) attempting to pass a counterfeited $20.00 Federal Reserve Note in violation of 18 U.S.C. §§ 2 and 472, (2) possessing 121 counterfeited Federal Reserve Notes in violation of 18 U.S.C. §§ 2 and 472, and (3) conspiring to possess and pass counterfeited Federal Reserve Notes in violation of 18 U.S.C. § 371. Both defendants were tried together before a jury and Allison was found guilty on all three counts, but Freedman was convicted only of Count II, the possession count. Upon Allison's motion for judgment of acquittal based on the acquittal of Freedman on the conspiracy count, the District Court set aside Allison's conviction on Count III. Allison was sentenced to two 3-year concurrent terms and Freedman was sentenced to 1 year and 1 day.

### ALLISON'S APPEAL:

### THE STOP AND SEARCH

Allison contends that the District Court erred in denying his motion to suppress the counterfeit bills and in denying

his motion to suppress the in-court identification of him by the station manager. Allison's attack on the discovery and introduction into evidence of the counterfeit bills rests on three distinct legal theories. First of all, Allison contends that Deputy Collier's stopping of his vehicle required probable cause *and* that probable cause can not be based upon double hearsay. Relying upon *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), Allison argues that Deputy Collier had no personal knowledge of the attempted passing nor did he have information from anyone with such knowledge. Allison's reliance on *Aguilar* requisites for valid search warrants is misplaced. A police officer may make an investigative stop of an individual if he reasonably suspects that the individual is involved in criminal activity. Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Hall*, 557 F.2d 1114, 1116 (5th Cir. 1977). Nor was the stop unreasonable simply because Deputy Collier acted on hearsay knowledge. Reasonable suspicion may exist on the collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information. *See U. S. v. Agostino*, 608 F.2d 1035 (5th Cir. 1979); *U. S. v. Preston*, 608 F.2d 626 (5th Cir. 1979); *U. S. v. Ashley*, 569 F.2d 975 (5th Cir. 1978); *U. S. v. Nieto*, 510 F.2d 1118 (5th Cir. 1975); *Moreno-Vallejo v. U. S.*, 414 F.2d 901 (5th Cir. 1969). Here, the information acted upon had been personally given by the manager of the service station to Chief Bernatovitz who in turn accurately transmitted the information to Deputy Collier. Under these circumstances, Deputy Collier had reasonable suspicion to stop the car with the characteristics and occupants fitting the description of that given to him.

■ Allison next contends that the production of three counterfeit $20.00 bills from his wallet, in response to Deputy Collier's inquiry, did not give Deputy Collier probable cause to place Allison under arrest. Allison argues that possession of counterfeit bills without more is not a crime and, since Deputy Collier had no firsthand knowledge of Allison's intent to defraud (by attempting to pass the bills), he therefore had no legally sufficient reason to believe a crime had been committed. Probable cause for an arrest exists "when reasonably trustworthy facts and circumstances are within the knowledge of the arresting officer to warrant a man of reasonable caution in the belief that an offense has been . . . committed." *U. S. v. Agostino*, 608 F.2d 1035, 1037 (5th Cir. 1979) citing *Draper v. U. S.*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). As previously discussed, Deputy Collier's lack of firsthand knowledge adds nothing to Allison's argument. Although mere possession of counterfeit money is not a crime, when possession is coupled with reliable information that the possessor has attempted to pass the bill as genuine, the officer in the field is justified in concluding that an offense has been committed. Once Allison exhibited the three counterfeit $20.00 bills, Deputy Collier had probable cause to arrest him.

Lastly, Allison contends that his consent to search the trunk of the automobile was not voluntarily given. Allison asserts that the consent was not voluntary because (1) he was under arrest, (2) he was not informed of his rights to refuse consent to the search, (3) two police vehicles and two armed police officers were present, and (4) he did not aid in the search.

Although Allison also bases his consent issue on his contention that the arrest was illegal, we have held that the arrest was legal and therefore we are not faced with the fruit of the poisonous tree doctrine of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Instead, we must look to the totality of the circumstances to determine if the consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ Although Allison was under arrest at the time he consented, that, of itself, is not sufficient to establish that his consent was involuntary. *U. S. v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *U.*

*S. v. Hall*, 565 F.2d 917 (5th Cir. 1978). Although being placed under arrest is inherently intimidating, there is nothing to show Allison's will was overborne. There were three passengers in Allison's vehicle, yet there is no evidence of threats, promises, force, coercion, or abuse by either Deputy Collier or the other officer present. The officers' pistols were holstered during the entire episode. Allison had been given his warning to remain silent and if he had done so no consent could have been given.

■ Regarding knowledge of the right to refuse consent, the Supreme Court has held that "while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973); *U. S. v. Garcia*, 496 F.2d 670 (5th Cir. 1974). Here, no additional factors such as age or education have been shown which would demonstrate Allison's ability to refuse consent. Although Allison did not actively aid in the search of the trunk, he did get the keys from the ignition and open the trunk. He stood by the entire time and never stated any objection to the search. We cannot say the District Court's finding of consent was erroneous.

## THE PHOTO IDENTIFICATION

Allison's second point of error contends that the photo identification procedure used by the secret service agent was impermissibly suggestive and therefore the manager's in-court identification of Allison should not have been allowed. Allison argues that the photographs contained dates and counties indicating when and where the photographs were taken. In addition he argues that there was no compelling urgency for the photographic identification and that a traditional lineup would not have imposed a burden on the government or the witness.

■ Taking the latter argument first, the fact that there may have been time for a lineup can play no part in whether the photographic spread was impermissibly suggestive. "Whether other more desirable methods of identification (e. g. a line-up) were available, or whether there was a compelling need for speedy identification are . . . not relevant to a determination of the impermissibly suggestive issue." *U. S. v. Sutherland*, 428 F.2d 1152, 1156 (5th Cir. 1970), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1970). Regarding the photographic spread itself, the Supreme Court has held that convictions based on eyewitness identification at trial following a pretrial identification by a photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise "to a very substantial likelihood of irreparable misidentification." *Simmons v. U. S.*, 390 U.S. 377, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). *See also, McGuff v. Alabama*, 566 F.2d 939 (5th Cir. 1978); *U. S. v. Williams*, 592 F.2d 1277 (5th Cir. 1979). The government contends that the issue of Allison's identity was never in issue, but rather that his defense was that Allison did not know the bills were counterfeit. We cannot agree. Perhaps the trial was conducted with this theory of defense, but it is quite likely that this was due to the District Court's pre-trial refusal to suppress the in-court identification. Allison sought suppression of the identification and objected to it at trial and should not be foreclosed from raising the issue on appeal. However, even if the photographic spread may have been somewhat suggestive, we hold that there was no substantial likelihood of irreparable misidentification. Upon Deputy Collier's initial conversation with Allison, Allison by his own statement admitted that he was one of the parties involved in the attempted passing. This admission was admitted into evidence and, by itself, placed Allison at the scene and rendered the station manager's in-court identification merely cumulative. Therefore, Allison has failed to demonstrate a substantial likelihood or irreparable misidentification.

## FREEDMAN'S APPEAL

■ Defendant Freedman challenges her conviction on the sufficiency of the

evidence. At the outset, the government contends that, since Freedman made no motion for judgment of acquittal either at the close of the government's case or at the conclusion of her case, appellate review of sufficiency of the evidence is unavailable unless denying appeal of the issue would foster a manifest miscarriage of justice. *See U. S. v. Perez*, 526 F.2d 859, 864 fn. 7 (5th Cir. 1976). The government overlooks the fact that Freedman did make a motion for judgment of acquittal within seven (7) days after the jury had returned a guilty verdict. Under Rule 29(c) of the Federal Rules of Criminal Procedure, Freedman has preserved her right of appellate review. *U. S. v. Mann*, 557 F.2d 1211, 1216 n. 6 (5th Cir. 1977); *Kemp v. U. S.*, 415 F.2d 1185, 1187 (5th Cir. 1969) *reh. denied*, 419 F.2d 383, 383–384 (5th Cir. 1969), *cert. denied*, 397 U.S. 969, 90 S.Ct. 1008, 25 L.Ed.2d 263 (1970).

Although Freedman has preserved her appellate review, we must view the evidence to support her conviction in the light most favorable to the government, *Glasser v. U. S.*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and all credibility choices and inferences must be made in support of the jury's verdict, *U. S. v. Sink*, 586 F.2d 1041 (5th Cir. 1978) *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). Freedman complains that the evidence against her is circumstantial, however, circumstantial evidence may serve as a basis for conviction. *U. S. v. Ochoa*, 609 F.2d 198, 203 (5th Cir. 1980). The test for judging sufficiency is the same for direct or circumstantial evidence and the test is "whether reasonable minds could have found the evidence inconsistent with every reasonable hypothesis of the defendant's innocence." *U. S. v. Slone*, 601 F.2d 800 (5th Cir. 1979).

Freedman was convicted, on Count II, of possessing 121 counterfeit bills with intent to defraud. The government's case in support of her conviction rests solely on the theory of constructive possession and whatever inference could be drawn from the fact that she attempted to pass a counterfeit $20.00 bill. In order to support their theory of constructive possession, the government had to prove that Freedman knew or should have known about the counterfeit bills in the trunk. In order to prove the requisite intent to defraud, the government had to prove Freedman knew the bills were counterfeit. *U. S. v. Slone, supra.*

Allison and Freedman both testified that she knew absolutely nothing of the money in the shaving kit, in the trunk. Freedman's defense was that Allison gave her the $20.00 bill with which to pay for the gas and that she did so not knowing either that the bill was counterfeit or that 117 more of the counterfeit bills existed in Allison's shaving kit in the trunk. There was no evidence presented to show that Freedman ever had the keys to the trunk or access to Allison's shaving kit. A search of Freedman showed, that, while she had over $500.00 in genuine currency, she had no counterfeit bills on her person or in her purse. Although the jury was free to disbelieve her testimony, their disbelief did not eliminate the requirement that the government prove each element of the charged offense beyond all reasonable doubt. However, the government's evidence was totally consistent with Freedman's version of her innocence. The government presented no evidence of direct fact or fact upon which a reasonable inference could be drawn which would show that Freedman knew of the existence of the bills or of their counterfeit nature. Certainly, the jury could not have reasonably found that the government's evidence was inconsistent with every reasonable hypothesis of Freedman's innocence. A contrary finding would be nothing more than guilt by association. Because we reverse Freedman's conviction on the sufficiency issue, we need not address her other point of error.

In summary, we AFFIRM the conviction of Thomas Wayne Allison and REVERSE the conviction of Sharon Lynn Freedman and order that the charges against her be dismissed.

AFFIRMED in part; REVERSED in part.