UNITED STATES of America, Plaintiff,

v.

Rocco FILIPPONIO, Defendant.

No. 81 CR 371.

United States District Court,
N.D. Illinois, E.D.

March 11, 1983.

---

Dan K. Webb, U.S. Atty., Candace J. Fabri, Charles Sklarsky, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Sam Adam and Jeffrey B. Steinback, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS

SHADUR, District Judge.

Rocco Filipponio ("Filipponio") has been indicted on one count charging unlawful possession of cocaine with intent to deliver, two counts charging possession of firearms while a convicted felon and one count charging unlawful possession of an unregistered firearm. Filipponio has moved to suppress certain evidence obtained during his April 1980 arrest, and that motion (now fully briefed) will be dealt with in these Findings and Conclusions.

On December 17, 1982 Filipponio, having been fully advised of his rights, waived jury trial both orally and in writing with the written consent of the government and the written approval of this Court, in accordance with Fed.R.Crim.P. ("Rule") 23(a). On December 29, 1982 this Court then proceeded with a trial without a jury under Rule 23(c).

At trial the government introduced a stipulation covering (1) the nature and basis for admissibility of testimony of the two arresting officers, (2) physical evidence seized during the arrest and (3) certain stipulated facts. That constituted the entire trial record.

Except as otherwise indicated in these Findings and Conclusions, both the specific and general findings that follow (both matters termed "Findings" and those termed "Conclusions") are based on evidence that supports them beyond a reasonable doubt. To avoid the cumbersome over-use of language, the words "find" and "beyond a reasonable doubt" have been omitted in favor of using declarative sentences, but all such sentences are intended to and do carry the intended findings to that effect.

### Findings of Fact ("Findings")

Late in the evening of April 24, 1980 Buffalo Grove Police Officer Chuck Weidner ("Weidner") was on routine patrol, driving eastbound on Lake-Cook Road (Tr. 10–11). About 10:15 p.m. he saw a white Cadillac cross the center line between the two eastbound lanes at least seven times (Tr. 11, 49, 52). Weidner radioed two other Buffalo Grove police units to have them stop the Cadillac, but both were on other assignments (Tr. 12). Weidner then radioed the dispatcher he was about to stop a weaving and possibly drunken driver (Tr. 51) and activated his Mars lights to signal the Cadillac to pull over (Tr. 12–13). When the driver failed to respond, Weidner flashed his spotlight into the vehicle's rear view mirror. This time the driver got the message and pulled over (Tr. 13).

Weidner parked his squad car behind the Cadillac and walked to the driver's side of the car (Tr. 14). Two people were in the Cadillac: Filipponio (the driver) and a woman sitting in the front right passenger's seat (Tr. 14). Filipponio asked why he had been pulled over. Weidner said Filipponio had been stopped for weaving and asked to see his driver's license (Tr. 15).

At that time Officer Robert Quid ("Quid"), who had heard Weidner's earlier radio transmissions, arrived at the scene as a "back up" officer and promptly joined Weidner at the driver's side of the car (Tr. 60, 93–94). Because of Filipponio's alcoholic breath and his slurred speech,[1] Weidner

---

1. Weidner's non-inclusion of these signs of Filipponio's intoxication in his police report or in his preliminary hearing testimony does not undercut Weidner's testimony on this score, as Filipponio suggests. At the time of trial, after extended discussion and then a material modification of its originally drafted language, the stipulation of the parties was changed to provide specifically (Stip. ¶ 1):

The testimony of Officer Robert Quid and Officer Charles Weidner submitted herewith as Exhibit 1 is truthful testimony and the credibility of those witnesses is not an issue before this court in this stipulated bench trial.

asked Filipponio to step out of the car for a field performance test of sobriety (Tr. 15). Filipponio opened the driver's door and rose from the car (Tr. 16), but he then turned around and leaned back into the car, apparently to kiss the female passenger (*id.*). He began fumbling around his left side at the belt area with his right hand, while with his left hand he lifted or perhaps put something into a briefcase on the front seat (Tr. 17). Neither Weidner nor Quid, who was standing at the left side of the opened door, could see just what Filipponio was doing with the briefcase (Tr. 17, 95–96).

When Filipponio then proceeded to back out of the car, his left side came into contact with Weidner. Weidner felt a hard object inside Filipponio's jacket pocket, thought it might be a weapon, reached in and pulled out a large hunting knife (Tr. 17). In addition, the pocket contained a small vial (Tr. 17, 73–74).[2] After placing those objects on the Cadillac's roof, Weidner tugged Filipponio's shoulder and asked him to get out of the car (Tr. 17–18). As Filipponio emerged from the car, a black holster containing a Star semi-automatic pistol fell out of his left pants leg (Tr. 18, 97). Quid quickly retrieved the weapon and holster, while Weidner escorted Filipponio

to the rear of the Cadillac (Tr. 19, 97–98). Weidner handcuffed Filipponio, placing him under arrest for unlawful use of a weapon. Weidner also frisked him but found no other weapons.

Filipponio expressed great fear of returning to jail and offered the officers $4,000 to forget the arrest.[3] Quid then advised Filipponio of his *Miranda* rights (Tr. 20, 98). But Filipponio continued to implore the officers to release him, sweetening his initial offer with the promise of an additional $5,000 he said was at his apartment (Tr. 21, 100). After the officers did not respond to those offers, Filipponio told them "another ounce and another piece" were in *his* briefcase in the front seat (Tr. 22, 100–101). Weidner brought the briefcase, which was locked with a combination lock, to the back of the car where Filipponio was standing. Filipponio told the officers they could have "5 g's apiece plus whatever is in the briefcase. You will find another ounce and another piece, it is yours if you let me go" (Tr. 23, 102). Then he gave the officers the combination to the briefcase lock (Tr. 19).[4] Opening the briefcase, Weidner found an Ingram automatic machine gun, three clips of ammunition and two clear bags containing a white powdery

As originally drafted the stipulation had been ambiguous (literally read, it could have meant only the *transcript* and not the *testimony* was "truthful"—that is, accurate). Both for that reason and because this Court as the trier of fact would not have the opportunity to observe the officers' demeanor, this Court proceeded to question Filipponio and his counsel at some length to make certain they intended the Weidner-Quid *testimony* to be treated as truthful and fully credited by this Court. Both assured this Court they did, and the stipulation was recast to the form quoted above. Theirs was a fully informed judgment (they were entirely familiar with the testimony from the earlier state court trial, as this Court was not at that time), and they cannot now essay to undo their stipulation or its consequences.

Nor does omission of the matter from the police report and preliminary hearing testimony create a reasonable doubt so as to preclude these findings, both for the reason just discussed and for the reason mentioned at n. 4.

**2.** Filipponio was not charged with possessing the contents of that vial.

**3.** In fact Filipponio turned out to have $2,800 in cash on his person. Again that fact does not subvert the officers' testimony under all the circumstances (including those referred to in n. 1).

**4.** Once more Filipponio argues that the failure of Weidner's police report to mention Filipponio's disclosure of the briefcase combination belies Weidner's testimony on this score. But again Filipponio's stipulation to the truthfulness of Weidner's account forecloses that argument. It is of course a familiar pattern in criminal cases for defense counsel cross-examining police officers to attempt impeachment by pointing to omissions from their reports, followed by the prosecutor's redirect examination to attempt rehabilitation by eliciting the officer's answer that not every detail is mentioned in such reports. Invariably the question thus becomes one of credibility and weight. At least where the testimony is not inherently incredible (and it surely is not here), the stipulation as to its truthfulness governs, and no reasonable doubt need be (or is) found.

substance correctly described by Filipponio as "coke" (Tr. 23–24). Filipponio renewed his offer of the briefcase's contents and $5,000, but to no avail. Then the officers transported Filipponio and all the items seized to the Buffalo Grove Police Station for processing.

Further investigation uncovered other incriminating facts. Both the Star semi-automatic pistol (Stip.Ex. 3) and the Ingram automatic weapon (Stip.Ex. 4) were loaded at the time of Filipponio's arrest (Tr. 29, 105; 38, 39) and had travelled in interstate commerce before April 24, 1980 (Stip. ¶¶ 2(b) and 2(c)). In addition, the Ingram machine gun was not registered in the National Firearms Registration and Transfer Record on or before April 24, 1980 (Stip. ¶ 2(c)). According to laboratory tests, the two bags of cocaine in the briefcase contained a total of 55 grams of 79% pure cocaine (Stip. ¶ 2). Finally, Filipponio was a convicted felon on April 24, 1980 (Stip. ¶ 3).

### Conclusions

#### Filipponio's Motion To Suppress

Each search and seizure conducted by Weidner and Quid comported with Fourth Amendment principles. Each progressive stage will be dealt with in turn:

■ 1. Weidner's initial request to Filipponio to get out of the car was a reasonable "seizure" because it was made while Filipponio was lawfully detained for a traffic violation. *Pennsylvania v. Mimms*, 434 U.S. 106, 109–11, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977) upheld the reasonableness of an identical request, issued after the driver was lawfully detained for operating a car with an expired license plate, because "legitimate concerns for the officer's safety" outweighed what the Court found a *de minimis* "intrusion into the driver's personal liberty." As *Mimms* makes plain (434 U.S. at 109, 98 S.Ct. at 332), the absence of any unusual or suspicious behavior on Filipponio's part has no bearing on the propriety of Weidner's request.

■ 2. Weidner's subsequent "pat down" also accorded with Fourth Amendment strictures under the standard announced in *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889 (1968). Again *Mimms* is squarely on point (434 U.S. at 111–12, 98 S.Ct. at 333):

> There remains the second question of the propriety of the search once the bulge in the jacket was observed. We have as little doubt on this point as on the first; the answer is controlled by *Terry v. Ohio, supra.* In that case we thought the officer justified in conducting a limited search for weapons once he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous. Under the standard enunciated in that case—whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate"—there is little question the officer was justified. The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of "reasonable caution" would likely have conducted the "pat down."

■ 3. Seizure of the Star semi-automatic weapon obviously passes Fourth Amendment muster under the "plain view" doctrine. *Ker v. California*, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 1634, 10 L.Ed.2d 726 (1963); *United States v. Sanders*, 631 F.2d 1309, 1314 (8th Cir.1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981).

■ 4. Finally, the search of Filipponio's briefcase just as plainly survives Fourth Amendment scrutiny because he freely consented to it. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Filipponio voluntarily permitted the two officers to search the briefcase in the hope of bribing them with its contents. Indeed his uncoerced disclosure of the briefcase combination underscores the voluntariness of his

consent. *Accord, United States v. Allison,* 616 F.2d 779, 783 (5th Cir.), *cert. denied,* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980) (driver voluntarily consented to search of his trunk by retrieving the keys from ignition, opening the trunk and failing to raise any objections during search). While Filipponio sought to condition his offer of the briefcase's contents on his release, he did not so qualify his consent to the actual search. Thus the officers' refusal to free Filipponio in no way detracted from the voluntary nature of his consent, particularly when the bribe was wholly unsolicited by the officers and was made after he was informed of his *Miranda* rights.

Accordingly Filipponio's motion to suppress must be and is denied. And once the physical evidence thus becomes part of the trial record, evidence of his guilt is compelling.

*Unlawful Possession of Cocaine*

■ On April 24, 1980 Filipponio possessed about two ounces of cocaine of a very high degree of purity. Possession may be actual or constructive. Here the evidence overwhelmingly supports a finding of constructive possession, for Filipponio clearly had "dominion or control" over the controlled substance—the power "to reduce an object to actual possession." *United States v. Martinez,* 588 F.2d 495, 498 (5th Cir.1979).

First, Filipponio conceded his ownership of the briefcase (Tr. 22).[5] Furthermore he implicitly acknowledged ownership of the cocaine inside the briefcase by identifying the contents to the officers while the briefcase was still closed and offering the contraband to the officers as a bribe. Finally and equally important, Filipponio knew the combination to the briefcase's lock—the "key" that afforded access to the cocaine. *Martinez,* 588 F.2d at 498–99 (defendant car passenger shared dominion and control over vehicle and marijuana because he possessed trunk key and the keys to two chests containing the contraband that were kept in the trunk).

■ There is a clear basis under the authorities for finding Filipponio intended to distribute the cocaine found in his briefcase. It amounted to 55 grams (about 2 ounces) of 79% pure uncut cocaine. That translates to 43.45 grams of 100% pure cocaine, a quantity that exceeds the amounts found by other courts to be substantial enough to warrant a finding of intent to deliver. *See United States v. Ramirez-Rodriguez,* 552 F.2d 883, 884 (9th Cir.1977) (13.74 grams of 30% pure cocaine, equivalent to 4.12 grams at 100% purity, found in a prison); *United States v. Echol,* 477 F.2d 37, 39–40 (8th Cir.1973) (187.65 grams at 14.17% purity and 12.8 grams at 63.5% purity, which together are equivalent to 34.72 grams of pure cocaine). Cases rejecting the inference of intent to distribute *as a matter of law* have involved much smaller quantities. *See Turner v. United States,* 396 U.S. 398, 422–23, 90 S.Ct. 642, 655, 24 L.Ed.2d 610 (1970) (14.68 grams of 5% potency, or .73 grams of pure cocaine); *United States v. Olvera,* 523 F.2d 1252, 1253 (5th Cir.1975) (2 grams of 16.8% potency, or .31 grams of pure cocaine). Finally, the high purity of the cocaine would require that it be cut before use (though that would be true whether Filipponio were a marketer or simply a user).

But this Court is not called on to decide (as were the courts in the cited cases) whether a jury's determination of guilt has sufficient support in the evidence as a matter of law. Instead it must itself make the "beyond a reasonable doubt" finding. It has had to do so as to Filipponio once before, with respect to about one ounce of cocaine of like purity (No. 81 CR 361, Mar. 22, 1982). At that time it found that:

> It cannot be said that the government has proved beyond a reasonable doubt that Filipponio possessed the specific controlled substance charged in Count One with intent to distribute. Possession, yes; intent to distribute, no.

**5.** Filipponio's admission of ownership unquestionably related to the briefcase rather than the "valise" (Filipponio's characterization of what Weidner described as a "large purse"), which apparently was also on the Cadillac's front seat. Weidner's testimony (Tr. 22) leaves no doubt on that score.

■ ·Here the circumstances differ significantly. Filipponio's transportation of the cocaine (contained in a briefcase) in a vehicle, all the while carrying a firearm on his person with another readily available, creates a far stronger inference of intent to distribute.[6] But it is unnecessary to rely on inferences, for Filipponio in fact sought to distribute the cocaine to the officers—his offer to them reflected not only an intent to deliver the cocaine (a large quantity) but an awareness of its value as a marketable commodity. Taking .all the circumstances into account, the government has proved not only possession but intent to distribute beyond a reasonable doubt.[7]

### Knowing Possession of Firearms by Convicted Felon

On April 24, 1980 Filipponio possessed two firearms, a Star semi-automatic pistol and an Ingram automatic machine gun, in violation of 18 U.S.C.App. § 1202(a)(1). All three elements of the two offenses—(1) knowing and willing (2) possession of a firearm (3) by a previously convicted felon—have been established beyond a reasonable doubt.

■ Filipponio is concededly a convicted felon (Stip. ¶ 3). Without question he had actual possession of the semi-automatic pistol, which was kept in a holster underneath his left pants leg. And for the same reasons already discussed as to the two bags of cocaine, he had constructive possession of the machine gun in the briefcase. Finally, Filipponio was aware he possessed the firearms, satisfying the mens rea component of this offense. *United States v. Laymon,* 621 F.2d 1051, 1054 (10th Cir.1980). By offering the two officers the "piece" in the briefcase, Filipponio displayed the requisite knowledge as to the machine gun. Awareness of the holstered pistol needs no discussion.

### Possession of Unregistered Firearm

On April 24, 1980 Filipponio violated 26 U.S.C. §§ 5841, 5861(d) by possession of a firearm—the Ingram automatic machine gun—not registered in the National Firearms Registration Transfer Record. That offense also has three ingredients: (1) knowing (2) possession (3) of an unregistered firearm.

■ To satisfy the mens rea requirement, the government need only prove the defendant knew his weapon was a firearm. Awareness of the unregistered status of the firearm is irrelevant. *United States v. Freed,* 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971). Thus the knowledge and possession components of this offense are satisfied for the same reasons expressed in the preceding section of these Conclusions. As for the final element, Filipponio has stipulated the Ingram machine gun was unregistered (Stip. ¶ 2(c)).

\* \* \*

Accordingly the Court finds that the government has established beyond a reasonable doubt that defendant Rocco Filipponio is guilty as charged in each of Counts One, Two, Three and Four of the indictment.

---

6. It may be noted parenthetically that this record—unlike the earlier case—contains no evidence Filipponio is a *user* of narcotics. This decision does not however rest on that fact.

7. This Court is not bound by any possibly different conclusion in the state criminal proceedings against Filipponio for state law offenses arising out of the same arrest. *See United States v. Agee,* 597 F.2d 350, 360 (3d Cir.), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979) (collateral estoppel principles do not bar federal government from litigating propriety of search previously found illegal in state court proceedings arising out of same incident).