28 F.3d 1214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry Doby BELL and Jerome E. Adams, Defendants-Appellants.
 Nos. 93-5933, 93-5952.
 United States Court of Appeals, Sixth Circuit.
 July 12, 1994.
 
 Before MILBURN and BATCHELDER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In these consolidated cases, defendants Larry Doby Bell (No. 93-5933) and Jerome E. Adams (No. 93-5952) appeal their jury convictions of one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. Sec. 922(g)(1), one count of aiding and abetting in the use of a firearm during a drug trafficking offense in violation of 18 U.S.C. Secs. 924(c)(1) and 2, one count of aiding and abetting the possession of cocaine with the intent to distribute in violation of 18 U.S.C. Secs. 841(a)(1) and 2, and one count of aiding and abetting the possession of marijuana with the intent to distribute in violation of 18 U.S.C. Secs. 2 and 841(a)(1). On appeal, both defendants raise the following issues: (1) whether the district court erred by not suppressing evidence found during the warrantless search of the Desert Inn, (2) whether the district court erred by admitting inculpatory statements made by defendants prior to the time they were given Miranda warnings, and (3) whether sufficient evidence exists to support defendants' convictions for the use of a firearm during a drug trafficking offense. In addition, defendant Bell raises the issue of whether the government violated his rights under the Speedy Trial Act, 18 U.S.C. Sec. 3161. For the reasons that follow, we affirm in both cases.
 
 I.
 A.
 
 2
 Defendants were indicted in a six-count indictment on August 5, 1991. Defendant Adams entered a plea of not guilty on September 18, 1991. Defendant Bell was also scheduled to be arraigned on that day, but he failed to appear.
 
 
 3
 Adams filed a waiver of the Speedy Trial Act on December 20, 1991. On January 21, 1992, Adams filed a motion to suppress firearms seized on the day of his arrest. Subsequently, on January 31, 1992, Adams entered guilty pleas to the charges against him.
 
 
 4
 Defendant Bell was arraigned on the charges in the indictment on June 2, 1992. Thereafter, defendant Adams withdrew his guilty pleas. Further proceedings were set for June 29, 1992. On June 10, 1992, Bell's counsel filed a motion to continue the proceedings set for June 29, 1992, and in an order dated June 19, 1992, the district court granted the motion for a continuance. Further proceedings were set for July 6, 1992. On July 6, 1992, trial was set for August 20, 1992. However, on August 14, 1992, both defendants filed a motion for a continuance, and that motion was granted.
 
 
 5
 Therefater, a superseding indictment was returned on September 1, 1992. Count one charged Adams with being a felon in possession of a firearm in violation of 18 U.S.C. Sec. 922(g)(1), and count two charged Bell with the same offense. Count three charged Adams with using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. Secs. 942(c)(1) and 2, and count four charged Bell with the same offense. Count five charged both defendants with aiding and abetting the possession of cocaine with intent to distribute in violation of 18 U.S.C. Sec. 841(a)(1) and (2). Count six charged both defendants with aiding and abetting the possession of marijuana with the intent to distribute in violation of 18 U.S.C. Sec. 841(a)(1) and (2). Defendants entered pleas of not guilty to the charges in the superseding indictment on September 17, 1992.
 
 
 6
 On October 8, 1992, Bell moved to dismiss the indictment against him on the ground that his speedy trial rights had been violated. On October 15, 1992, Bell moved to suppress the evidence seized at his arrest on March 13, 1991. Finally, on October 21, 1992, Bell moved the district court to exclude inculpatory statements he made on March 13, 1991, prior to the time he was given Miranda warnings. Following a hearing, the district court denied Bell's first two motions on October 20, 1992.
 
 
 7
 Bell's third motion was overruled at the trial which began on October 21, 1992. On October 23, 1992, the jury convicted defendants on all of the charges against them in the superseding indictment.
 
 
 8
 Adams was sentenced to 120 months' imprisonment on each of the charges in counts one, five, and six of the superseding indictment, to be served concurrently, and a sentence of 60 months' imprisonment, consecutive to the other sentences imposed, on the charges in count three of the superseding indictment. In its judgment the district court noted that the sentence imposed, 180 months, was below the sentencing guideline range of 210 to 262 months; however, the court stated that a downward departure was warranted and set forth its reasons for the downward departure.
 
 
 9
 Bell was sentenced to 12 months' imprisonment on each of the charges in counts two, five, and six of the superseding indictment, to be served concurrently, and a sentence of 60 months' imprisonment, consecutive to the other sentences imposed, on the charges in count four of the superseding indictment for a total term of imprisonment of 72 months. In its judgment the district court noted that the 12-month sentences on counts two, five, and six were below the sentencing guideline range of 21 to 27 months; however, the court noted that a downward departure was warranted on each of those counts and set forth its reasons for the downward departure.
 
 
 10
 These timely appeals followed.
 
 B.
 
 11
 On March 13, 1991, officers of the Kentucky Department of Alcoholic Beverage Control ("ABC" or "Board") discovered quantities of cocaine and marijuana, which were packaged for resale, and two loaded handguns during an administrative inspection of the Desert Inn in Marion County, Kentucky. The Desert Inn is an alleged nightclub located on what was once a drive-in movie theater lot near Lebanon, Kentucky. Tom Simms, the owner of the property, is a real estate agent and resident of Marion County. Since closing the drive-in, Simms has used a building on the lot as rental property, leasing it to various people who have unsuccessfully tried to turn it into a nightclub.
 
 
 12
 On July 1, 1990, Simms leased the building to Terry Cambron, who operated a nightclub in the building known as the Desert Inn. Cambron received a license to sell malt liquor from the ABC shortly after July 1, 1990. Although Simms and Cambron discussed operating the nightclub as a private bar, Cambron operated the Desert Inn as a nightclub which was open to the public. With the help of David Thompson, however, Cambron attempted to operate a private club at the Desert Inn on Sundays, and Cambron put up a cardboard sign stating "private club." However, Cambron and Thompson took down the "private club" sign after a Kentucky state trooper told them they would need a private club license, which they did not have. Cambron closed the Desert Inn in December of 1990 because he failed to make a profit.
 
 
 13
 Subsequently, in January 1991, Simms leased the building to someone named Sanders from Campbellsville, Kentucky, for the purpose of starting a nightclub. Simms helped to finance the venture; however, the nightclub closed in less than a month because it was not making money.
 
 
 14
 Bell approached Simms in February 1991 and stated that he would like to try the nightclub business. On February 25, 1991, Simms and Bell entered into a one-year lease effective February 13, 1991. Simms and Bell talked about treating the nightclub as either a public or private operation.
 
 
 15
 Rodney Mattingly is a resident of Marion County and an ABC officer. In September 1990, after Cambron received his malt liquor license, Mattingly performed an on-site inspection at the Desert Inn to make sure the licensee, Cambron, was in compliance with ABC regulations. Shortly after the inspection, Mattingly filed a report with ABC.
 
 
 16
 In early January 1991, Cambron saw Officer Mattingly at a grocery store in Marion County. Cambron told Mattingly that he was considering turning in his liquor license to the ABC, and Mattingly informed Cambron of the procedure to be followed. Cambron also told Mattingly that David Thompson was going to have several parties at the Desert Inn. Mattingly then informed Cambron that no one could serve beer on Cambron's license. Subsequently, Elmer George, Cambron's attorney, mailed the license to the ABC, which received it on January 29, 1991. The license was cancelled at that time.
 
 
 17
 On March 6, 1991, Mattingly received a complaint that distilled spirits and possibly drugs were being sold at the Desert Inn. Mattingly, who was unaware that the liquor license had been cancelled, promptly filled out a written complaint which included the Desert Inn liquor license number. Mattingly believed that the liquor license was still in effect because the license number was included in the list of renewed licenses issued by the ABC office in Frankfort, Kentucky, the previous July. In relying on the records he maintained at his office, including a field card he completed after he performed his on-site inspection, Mattingly followed the normal practice used by ABC officers. Although Mattingly could have called the ABC office in Frankfort and learned that the Desert Inn's liquor license had been cancelled, he did not do so.
 
 
 18
 On March 13, 1991, Mattingly and ABC officers Jack Miller and Sam Crain went to the Desert Inn to conduct an inspection. Officers Miller and Crain believed that the Desert Inn was licensed by the ABC based upon the complaint prepared by Mattingly. Mattingly, Miller, and Crain did not obtain a search warrant for their inspection of the Desert Inn premises because they relied on the provisions of K.R.S. Sec. 241.090 which states:
 
 
 19
 Police powers of state administrators and field representatives.--State administrators and all field representatives shall have the full police powers of peace officers, and their jurisdiction shall be coextensive with the state. They may inspect any premises where alcoholic beverages are manufactured, sold, stored or otherwise trafficked in, without first obtaining a search warrant. They may confiscate any contraband property.
 
 
 20
 The ABC officers arrived at the Desert Inn at approximately 6:10 p.m. on March 13, 1991. At that time, there were no signs on the outside of the Desert Inn designating it as a private club. Further, although Kentucky law requires posting of liquor license numbers, there was no liquor license number posted on the outside of the Desert Inn. When the ABC officers entered the unlocked door of the Desert Inn, they entered a room approximately sixteen feet long and twenty feet wide. At the rear of the room, a bar stand stood about six feet from the back wall. No one checked the officers' identification as they entered the club, and no one questioned their right to enter the premises.
 
 
 21
 Four men were present in the Desert Inn at the time of the officers' entry. Defendants Bell and Adams were behind the bar, and Larry Smith and Benny Hazelwood were sitting at the bar. Officer Miller held up his ABC identification and badge, identified Officers Mattingly, Crain, and himself as ABC officers, and stated that they had received a complaint and were there to perform an inspection. At that point, Officer Crain stood in the open door of the Desert Inn watching his car in the parking lot to be sure that neither the vehicle nor any of the equipment inside it would be stolen.
 
 
 22
 After the officers had been identified, Officer Mattingly asked Smith and Hazelwood to step outside. Mattingly then asked the defendants where the liquor license was and who was in charge of the premises. Defendants responded that they were working for David Thompson and that Thompson must have the liquor license at home because they did not have it. Officer Mattingly then asked Larry Smith for his assistance in locating David Thompson.
 
 
 23
 While Mattingly was talking to defendants, Officer Miller began his inspection. He observed two cases of whiskey in plain view on the left side of the bar stand. One case contained 15 bottles and the other case contained 23 bottles.
 
 
 24
 Just below the bar stand were some beer coolers. Miller began opening the beer cooler doors and found seven individually wrapped bags of marijuana in a "Pik n Pay bag." After removing the bags of marijuana from the cooler, Miller observed two handguns on a table located behind a "boom box" between the bar and the rear wall. Miller unloaded the weapons and went outside to use his car radio to run a check on the weapons to determine if they were stolen.
 
 
 25
 Miller had not spoken to Bell or Adams, and neither had been told they could not leave. Neither defendant attempted to leave. Further, none of the ABC officers had drawn their guns, had restricted the movements of Bell and Adams, or had any physical contact with them in any way.
 
 
 26
 Subsequently, Miller reentered the Desert Inn and asked defendants to whom the guns belonged. Adams stated that one of the guns, a 9 mm. Iner Arms automatic pistol, was his. Bell stated that the .357 Smith and Wesson revolver was his. Miller then placed defendants under arrest and read them their Miranda rights.
 
 
 27
 Adams then asked for the denim Levi jacket which was on the chair where he was sitting. Before giving the jacket to Adams, Miller searched the jacket and discovered a little brown vial with a white powder substance in it, a partially smoked marijuana joint, a pack of rolling papers, and five live 9 mm. cartridges. The 9 mm. cartridges could be fired from the 9 mm. pistol found behind the bar. While Miller was speaking to defendants, Officer Crain noticed that they were looking over at a Zesta cracker box with plastic bags stuffed into the top of it. The Zesta cracker box was located on the table behind the bar upon which the guns had been found. Officer Miller pulled out the two plastic bags from the Zesta cracker box. One plastic bag contained 40 smaller plastic bags of cocaine, and the other plastic bag contained 11 smaller bags of cocaine.
 
 
 28
 Officer Miller also discovered a locked bowling bag sitting next to defendant Adams. Miller asked if anyone had a key and defendant Adams responded that he did. Defendant Adams then gave the key to Officer Miller. Officer Miller unlocked the bag and found several items, including $280 in cash, receipts for purchases of food and alcohol, and a bank deposit slip. The deposit slip was for the People's Bank in Lebanon, Kentucky, in the business name of the Desert Inn, and the deposit was made out in Adams' name.
 
 
 29
 Subsequently, defendants were transported to the Marion County jail by a Kentucky State Trooper. At the jail, Officer Miller recovered $470 in cash from Adams.
 
 
 30
 Finally, at trial, there was testimony as to the nature of the Desert Inn. John Cowherd, Adams' uncle, testified that he was a member of a private club known as the Desert Inn. Cowherd claimed that there were 75 to 100 members of the club and that each had a membership card stating "Desert Inn Country Club." However, Cowherd also testified that nonmembers were admitted to the premises of the Desert Inn and that no one was turned away because they were not a member.
 
 
 31
 Tommy Spalding testified that he went to the Desert Inn to shoot pool. Spalding also testified that he was not aware that the Desert Inn was a private club and that he never saw any private club signs.
 
 II.
 A.
 
 32
 Defendants argue that the district court erred when it overruled their motions to suppress the evidence seized by the ABC officers following their search of the Desert Inn on March 13, 1991. Defendants assert that the search was an impermissible warrantless search in violation of the Fourth and Fourteenth Amendments.
 
 
 33
 Although defendant Adams filed a motion joining in defendant Bell's motion to suppress the evidence, defendant Adams lacked standing to challenge the search and seizure of evidence from the premises of the Desert Inn. A defendant has the burden of establishing his standing to challenge a search or seizure which allegedly violated the Fourth Amendment. United States v. Sangineto-Miranda, 859 F.2d 1501, 1510 (6th Cir.1988) (citing Rakas v. Illinois, 439 U.S. 128, 130 n. 1 (1978)). In order to establish standing to challenge the search and seizure of evidence from the Desert Inn, defendant Adams must show that he had a legitimate expectation of privacy in the premises. United States v. Trickey, 711 F.2d 56, 58 (6th Cir.1983) (citing, United States v. Salvucci, 448 U.S. 83 (1980)). Since defendant Adams was neither the owner nor the lessee of the Desert Inn, he would not be recognized by society as having a legitimate expectation of privacy in the premises. Trickey, 711 F.2d at 58-59. Therefore, only defendant Bell, as the lessee of the Desert Inn, had standing to challenge the search and seizure of evidence from the premises of the Desert Inn on March 13, 1991.
 
 
 34
 In this case, the district court found that when the ABC officers entered the Desert Inn, they were acting under a good faith belief that the Desert Inn was licensed. Further, the district court found that there was nothing such as a sign, barricade, or locked door which would have informed the ABC agents that they were not free to enter the Desert Inn premises.
 
 
 35
 This court will uphold a district court's factual findings made in consideration of a motion to suppress unless they are clearly erroneous. United States v. Williams, 962 F.2d 1218, 1221 (6th Cir.), cert. denied, 113 S.Ct. 264 (1992). However, we review a district court's conclusions of law de novo. Id. Finally, we must review the evidence " 'in the light most likely to support the district court's decision.' " Id. (quoting United States v. Gomez, 846 F.2d 557, 560 (9th Cir.1988)).
 
 
 36
 The Fourth Amendment exclusionary rule prohibits the introduction into evidence of tangible materials seized during an unlawful search and also testimony concerning knowledge acquired during an unlawful search. Murray v. United States, 487 U.S. 533, 536 (1988). Further, the warrant clause of the Fourth Amendment protects commercial buildings as well as private homes, and the Supreme Court has held that warrantless searches of commercial premises are generally unreasonable. Marshall v. Barlow's Inc., 436 U.S. 307, 311-12 (1978). However, before a defendant can invoke the protection of the Fourth Amendment, he must show that he had a legitimate expectation of privacy in the area searched. United States v. Smith, 621 F.2d 483, 486 (2d. Cir.1980), cert. denied, 449 U.S. 1086 (1981). Thus, the ultimate question under the Fourth Amendment is whether an individual's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances. Id. at 487 (citing Rakas v. Illinois, 439 U.S. 128, 152 (1978)). The Fourth Amendment prohibition on unreasonable searches and seizures applies not only to traditional police searches of commercial premises for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes. New York v. Burger, 482 U.S. 691, 699-700 (1987). The expectation of privacy in commercial premises is less than the expectation in a dwelling place, and the expectation of privacy is "particularly attenuated in commercial property employed in 'closely regulated' industries." Id. at 700.
 
 
 37
 "[C]losely regulated" industries "have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." Barlow's, Inc., 436 U.S. at 313 (citing Katz v. United States, 389 U.S. 347, 351-52 (1967)). "Liquor ... and firearms ... are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation." Id. See also New York v. Burger, 482 U.S. at 701 ("The ... doctrine, stating the reduced expectation of privacy by an owner of commercial premises in a 'closely regulated' industry, has received renewed emphasis in more recent decisions [of the Court]".). Thus, since defendants were selling liquor on the premises of the Desert Inn, they had an attenuated expectation of privacy in the premises of the Desert Inn.
 
 
 38
 Moreover, in Illinois v. Krull, 480 U.S. 340, 349-53 (1987), the Supreme Court held that the Fourth Amendment exclusionary rule does not apply to evidence obtained by police who acted in objectively reasonable reliance upon a statute authorizing warrantless administrative searches, even if the statute is subsequently found to be an unconstitutional violation of the Fourth Amendment. See United States v. Curzi, 867 F.2d 36, 45 (1st Cir.1989) ("the Court has lately enlarged ... the good faith [exception to the warrantless search rule] to encompass 'evidence obtained by an officer acting in objectively reasonable reliance on a statute.' ").
 
 
 39
 In this case, the ABC officers entered and inspected the Desert Inn based upon the provisions of K.R.S. Sec. 241.090 which gives officers of the ABC the power to conduct administrative searches of premises where alcohol is sold. Nothing in the plain language of the statute makes any distinction between premises which are unlicensed by the ABC and premises which are licensed by the ABC. However, Officer Miller testified that it was the customary practice of ABC officers to obtain a search warrant for unlicensed premises. See Duke v. Commonwealth, 474 S.W.2d 885, 887 (Ky.1971), in which the Court of Appeals of Kentucky, then the state's highest court, stated that "the clear intent of the [Kentucky] Legislature [is] that Alcoholic Beverage Control Board officers have the right to inspect licensed premises without a search warrant to ascertain if the licensee is in violation of any of the rules and regulations governing such endeavors."
 
 
 40
 Even assuming arguendo that K.R.S. Sec. 241.090 gives ABC officers the right to inspect only licensed premises, the district court's conclusion that the officers acted in good faith reliance on the provisions of K.R.S. Sec. 241.090 is not clearly erroneous. Based upon all of the information available to the ABC officers, the officers were under an objectively reasonable impression that the Desert Inn was still an ongoing enterprise operating under the liquor license granted to Terry Cambron. Although Cambron did ask Officer Mattingly how to turn in his liquor license, Cambron never did tell Mattingly that he either intended to or had turned in his liquor license. Further, although Mattingly admitted that he could have telephoned the ABC offices in Frankfort and learned that the license had been cancelled, Mattingly's testimony is uncontradicted that calling Frankfort was not the usual and customary practice of ABC officers at that time. Finally, and most importantly, the record shows that when the ABC officers entered the Desert Inn on March 13, 1991, they asked defendants where the liquor license was prior to searching the premises. Defendants did not tell the ABC officers that they had no license; rather, they told the officers that they were working for David Thompson, and he had the license at his home. Accordingly, the district court's conclusion that the ABC officers acted in good faith reliance on the provisions of K.R.S. Sec. 241.090 because they had an objectively reasonable belief that the Desert Inn was licensed by the ABC is not clearly erroneous. Further, when the officers' objectively reasonable reliance on the provisions of K.R.S. Sec. 241.090 for their warrantless administrative search is combined with defendants' reduced expectation of privacy in the Desert Inn premises, we find that the district court did not err in failing to suppress the evidence seized at the Desert Inn on March 13, 1991.
 
 B.
 
 41
 Defendants argue that the district court erred in admitting the statements in which they admitted ownership of the firearms found at the Desert Inn because the ABC officers failed to give them Miranda warnings before questioning them. Defendants assert that Miranda warnings were required because they were in custody at the time Officer Miller questioned them concerning the ownership of the firearms.[1]
 
 
 42
 As noted above, this court reviews the district court's factual findings on suppression issues for clear error, while reviewing the legal conclusions of the district court de novo. United States v. Mills, 1 F.3d 414, 417 (6th Cir.1993). A person is entitled to receive Miranda warnings only if questioned while in custody. United States v. Macklin, 900 F.2d 948, 950-51 (6th Cir.), cert. denied, 498 U.S. 840 (1990) (citing Miranda v. Arizona, 384 U.S. 436, 445 (1966)). " 'When police ask questions of a suspect in custody without administering the required warnings, [the decision in] Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief.' " United States v. Sangineto-Miranda, 859 F.2d 1501, 1515-16 (6th Cir.1988) (quoting Oregon v. Elstad, 470 U.S. 298, 317 (1985)).
 
 
 43
 However, the "Supreme Court [has] refused to extend the safeguards of Miranda beyond cases where a suspect's 'freedom of action is curtailed to a "degree associated with formal arrest." ' " Macklin, 900 F.2d at 951 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam). "Whether a person is in custody depends upon 'how a reasonable man in the suspect's position would have understood his situation.' " Id. (quoting Berkemer, 468 U.S. at 442). "The subjective intent of the [police] officers is relevant ... only to the extent that that intent has been conveyed to the person confronted [by the officer]." United States v. Rose, 889 F.2d 1490, 1493 (6th Cir.1989) (citing United States v. Mendenhall, 446 U.S. 544, 554 n. 6 (1980)).
 
 
 44
 In this case, defendants were not restrained to a degree associated with a formal arrest and thus they were not in custody. Here, the ABC officers entered the Desert Inn which was open to the public. They told defendants who they were and why they were there; namely, to conduct an administrative inspection of the premises. Further, the ABC officers did not tell defendants that they were under arrest at the time of the questioning concerning the ownership of the firearms. Moreover, at the time defendants were questioned about the firearms, no guns had been drawn by the ABC officers, defendants had not been handcuffed or touched in any manner, and defendants had not been told that they were not free to leave. Although Officer Crain positioned himself in the doorway of the Desert Inn, the evidence showed that Crain was in the doorway to observe the ABC officers' vehicle. Moreover, despite Crain's presence in the doorway, both of the customers at the Desert Inn were allowed to leave.
 
 
 45
 Finally, defendants place great emphasis on Officer Miller's testimony that they would not have been allowed to leave the Desert Inn because they were in charge of the premises. However, it is clear from the record that Miller never indicated to the defendants that they were not free to leave the premises. Accordingly, even if Officer Miller's subjective intent was to restrain defendants in the Desert Inn, the defendants were not in custody because a reasonable person in defendants' situation would not have believed that they were not free to leave the Desert Inn since Miller's subjective intent was not conveyed to defendants. Therefore, since defendants were not in custody, Miranda warnings were not required, and the district court did not err in not suppressing the statements made by Bell and Adams concerning their ownership of the firearms found behind the counter at the Desert Inn.
 
 C.
 
 46
 Defendants argue that insufficient evidence was presented to sustain their firearm convictions under 18 U.S.C. Sec. 924(c)(1). Our standard of review for claims of insufficient evidence is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Evans, 883 F.2d 496, 501 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). There is no indication that either defendant made a motion for a judgment of acquittal during trial; however, after the jury's verdict on October 23, 1992, defendants filed written motions for a judgment of acquittal with the district court on October 29 and October 30, 1992. Under Federal Rule of Criminal Procedure 29(c), since defendants filed their motions for a judgment of acquittal within seven days of the verdict, they have preserved their right of appellate review of the sufficiency of the evidence. United States v. Allison, 616 F.2d 779, 783-84 (5th Cir.), cert. denied, 449 U.S. 857 (1980).
 
 
 47
 In this case sufficient evidence exists to support defendant's firearm convictions under 18 U.S.C. Sec. 924(c)(1). Defendants assert that the evidence was insufficient to show that they used the firearms during or in relation to a drug trafficking crime; rather, they assert that the evidence showed only that they possessed the weapons and that drugs were present in the Desert Inn.
 
 
 48
 This court has held that "the terms 'used' and 'carries' in section 924(c)(1) should be construed 'broadly.' " United States v. Brown, 915 F.2d 219, 224 (6th Cir.1990). In United States v. Henry, 878 F.2d 937, 944 (6th Cir.1989), this court adopted the "fortress analogy" theory, "which holds that if it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction, then such firearms are used 'during and in relation to' a drug trafficking crime." Id. (quoting United States v. Matra, 841 F.2d 837, 843 (8th Cir.1988)). A firearm will come within the "uses" provision of section 924(c) if "[t]he circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such a transaction." Id. (quoting United States v. Feliz-Cordero, 859 F.2d 250, 254 (2d Cir.1988)).
 
 
 49
 Here, the ABC agents seized 51 packets of cocaine and 7 packets of marijuana from the premises of the Desert Inn. From the manner in which the drugs were packaged, the jury could reasonably infer that the drugs were packaged for sale and that sales were occurring at the Desert Inn. Moreover, the complaint which Officer Mattingly received on March 6, 1991, stated that drugs were being sold at the Desert Inn.
 
 
 50
 Further, the guns were located on a table directly behind the bar at the Desert Inn and each defendant claimed ownership of one of the guns. In addition, there was testimony presented at trial that the guns were of the type preferred by drug dealers. Furthermore, a search of the Levi jacket belonging to defendant Adams resulted in the seizure of bullets which could be fired from his 9 mm. automatic pistol. From this evidence, a reasonable trier of fact could have concluded that drug transactions were occurring in the Desert Inn and that defendants had strategically located the guns behind the bar of the Desert Inn so that the guns would be quickly and easily available during a drug transaction. Therefore, sufficient evidence was presented at the trial to sustain defendants' convictions under 18 U.S.C. Sec. 924(c)(1).
 
 D.
 
 51
 Finally, defendant Bell argues that he was denied his statutory right to a speedy trial. Prior to the trial, Bell moved for dismissal of the indictment against him with prejudice based upon the government's failure to provide him with a trial within 70 days of his arraignment.
 
 
 52
 Bell was arraigned on June 2, 1992. Thus, the 70-day pretrial period began to run on June 3, 1992. See United States v. Monroe, 833 F.2d 95, 99 (6th Cir.1987) (the date of arraignment is excluded from the 70-day calculation). On July 6, 1992, the district court set Bell's trial date for August 20, 1992, 79 days after the date of Bell's arraignment.[2] Bell asserts that this 79-day period violated his right to a speedy trial.
 
 
 53
 The Speedy Trial Act, 18 U.S.C. Secs. 3161-74, requires that the trial of a criminal defendant commence within 70 days from the date of the arrest, the filing of the indictment or information, or the first appearance before the court, whichever date last occurs. 18 U.S.C. Sec. 3161(c); United States v. Crawford, 982 F.2d 199, 202 (6th Cir.1993). However, pursuant to Sec. 3161(h) certain periods are excluded from the 70-day calculation. Id.; United States v. Mentz, 840 F.2d 315, 325 (6th Cir.1988).
 
 
 54
 Although Bell complains that he was denied his right to a speedy trial due to the 79-day period between June 3, 1992, and August 20, 1992, the district court did not err in concluding that there was no speedy trial violation because Bell failed to take into account the excludable time periods in his calculations. In this case, there are fifteen excludable days between June 3, 1992, and August 20, 1992. Thus, for purposes of the Speedy Trial Act, only 64 days elapsed during this period of time.
 
 
 55
 On June 5, 1992, the district court set June 29, 1992, as a date for further proceedings in the case. On June 10, 1992, Bell filed a motion to continue the date for further proceedings due to a conflict in his attorney's calendar. The district court granted the motion on June 19, 1992. Subsequently, on August 14, 1992, attorneys for defendants moved to continue the trial, which had been set for August 20. On August 20, 1992, the district court granted the motion to continue the trial.
 
 
 56
 Under 18 U.S.C. Sec. 3161(h)(1)(F) and (J), the fifteen-day period that the two motions, which are described above, were under advisement is excluded from the 70-day period. See Mentz, 840 F.2d at 326-27 (the under advisement period begins to run on the day a motion, which does not require a hearing, is filed; and, for motions which do not require a hearing, Sec. 3161(h)(1)(J) excludes a maximum of thirty days once the motion is under advisement).[3] Accordingly, the district court did not err in concluding that no speedy trial violation had occurred.
 
 III.
 
 57
 For the reasons stated, the district court's judgments in these consolidated cases are AFFIRMED in all respects.
 
 
 58
 * * *
 
 
 59
 * * *
 
 
 
 [1]
 The government asserts that defendants have waived review of this issue because they failed to file their motion to suppress their statements within the period required by the Local Rules of the district court. However, because defendants were not in custody at the time they made their incriminating statements, we need not resolve the issue as to whether defendants have waived review of the denial of their motion to suppress
 
 
 [2]
 In his brief on appeal, Bell does not argue that the time between August 20, 1992, and the actual commencement of his trial on October 21, 1992, violated his speedy trial rights
 
 
 [3]
 18 U.S.C. Sec. 3161 provides in relevant part:
 (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
 (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to--
 (F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
 (J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.